Ms. Rosie Lee PEGUES, Rebecca Gillespie, Mary Boyd and Robert Williams, Plaintiffs,

v.

MISSISSIPPI STATE EMPLOYMENT SERVICE OF the MISSISSIPPI EMPLOYMENT SECURITY COMMISSION et al., Defendants.

No. DC 72–4–S.

United States District Court, N. D. Mississippi, Delta Division.

March 7, 1980.

Richard T. Seymour, Lawyers Committee for Civil Rights Under Law, Washington, D. C., Nausead Stewart, Jackson, Miss., Richard B. Sobol, Washington, D. C., for plaintiffs.

Fred J. Lotterhos, Gen. Counsel, Leopoldo Thomas Aragon, Asst. Gen. Counsel, Mississippi Employment Security Commission, Jackson, Miss., for defendants.

Lutz Alexander Prager, Washington, D. C., and Charles A. Haycraft, Dist. Director, Jackson District Office, EEOC, Jackson, Miss., for amicus curiae defendant EEOC.

Craig A. Berrington, Jonathan H. Waxman, Acting Counsel for Litigation, Associate Sol. for Manpower, U. S. Dept. of Labor, Washington, D. C., and H. M. Ray, U. S. Atty. and John Hailman, Asst. U. S. Atty., Oxford, Miss., for amicus curiae Secretary of Labor.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

This action has been submitted to the court for decision after a fourteen-day trial on the merits in which all parties participated.

The court has received the memoranda of the parties and post-trial proposed findings of fact and conclusions of law. After a careful study of the evidence presented, the court has concluded for the reasons hereinafter given, that plaintiffs cannot prevail and the complaint must be dismissed.

### I. The Parties.

The plaintiffs, Rosie Lee Pegues, Rebecca Gillespie, Mary Boyd and Robert Williams are members of the black race. They reside in or near Bolivar County, Mississippi, and were job applicants at the Bolivar County or Cleveland, Mississippi local office (hereafter sometimes referred to as the "Cleveland MSES office", or the "Cleveland office") of the Mississippi State Employment Service (MSES). They have been permitted to prosecute a class action for the benefit of all black and female job applicants at the Cleveland MSES office who have received or may receive in the future, disparate treatment at the hands of the personnel at that office.

The defendants are:

1. The Mississippi State Employment Service (MSES), a division of the Mississippi Employment Security Commission.

2. John E. Aldridge, a resident of Hinds County, Mississippi. Mr. Aldridge was the Executive Director of the Mississippi Employment Security Commission from July 16, 1960, until his retirement at the end of February 1978.

3. Ernest C. Lindsey, a resident of Cleveland, Bolivar County, Mississippi. Mr.

Lindsey has been, and is presently, office manager of the Cleveland MSES office, serving in this capacity since November 1968.

4. The United States Secretary of Labor, currently the Honorable Ray Marshall, a resident of Washington, D. C.

5. The United States Department of Labor, represented herein by the Atlanta Georgia office of the United States Employment Service (USES).

The Federal Defendants, that is to say the Secretary of Labor, The Labor Department, and USES, have been released from the suit by prior order of the court except for their role as defendants to the third-party complaint of MSES, and other state defendants.

## II. Jurisdiction.

The action is predicated on Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.; 42 U.S.C. §§ 1981, 1983, and the Thirteenth and Fourteenth Amendments to the Constitution of the United States. Jurisdiction is vested pursuant to 28 U.S.C. § 1343(3) and (4).

## III. The Issues.

The named plaintiffs contend that the Cleveland MSES office discriminated against them because of their race and sex in classifying them for employment referrals and in making referrals. Defendants Aldridge and Lindsey are said to be personally liable to plaintiffs and members of their class because they knowingly participated in the action of the Cleveland MSES office in its discriminatory conduct.

The class represented by plaintiffs is described as a class of black persons and females who have sought, or in the future may seek, employment opportunities through referrals by the Cleveland MSES office and who claim that they have been, or in the future may be, the target of discrimination on the basis of race or sex.

The State Defendants claim indemnity from the Federal Defendants for any monetary recovery for which the State Defendants are held liable on account of back pay to plaintiffs or class members, suit costs, etc., in the event of an adverse judgment in the action. The State Defendants also seek injunctive relief from the Federal Defendants should the same become appropriate.

## IV. Plaintiffs' Evidence.

### A. The Named Plaintiffs.

1. Rosie Lee Pegues did not appear or testify at the trial of the case. Her record [SD Exhibit 58] reveals that at the time of the events upon which her Title VII charge was based, she was forty-six years of age. Her education was at the sixth grade level. The "Adult Basic Learning Examination" administered to her revealed a reading level of third grade, and math level of fourth grade. Her previous work history was in the field of farm work, maid, kitchen help, and housecleaning. She had also worked five months with the Headstart Program in Merigold, Mississippi. On her application Form 511, under "Type work preferred," she wrote she was not willing to accept a job out of the area. The 511 form reveals that she had been referred to the STAR Program [Systematic Training and Redevelopment] at Mound Bayou, Mississippi, a program designed to provide training to help remove employment barriers from persons with low educational, training, skill and experience levels. She participated in the program, but the program was terminated for lack of funds before it was completed. There was also an entry of termination for "loss of interest" on status change notice dated December 4, 1969, in her STAR file.

2. Rebecca Gillespie, at the time of the events upon which her Title VII charge was based, was twenty-eight years of age. Her education was at the eighth grade level, with tenth grade equivalency later achieved. The "Adult Basic Learning Examination" administered to her revealed a reading level of fifth grade, and math level of fifth grade. Her previous early work history was in a factory for one year [Alabama Metal, Rosedale, Mississippi], and as a cook-helper with the Headstart Program at Pace, Mississippi. She later worked as a nurse aide. She, too, had been referred to the STAR program to assist in removing her employment barriers, and participated

in the program until it was terminated. Before enrolling in that program, she had been referred by MSES to a job at Misceramic Tile, where she was not hired, and at the Bar B Q House, where she was hired, and worked for three days. September 26, 1969, counseling insert form shows "Mainstream [MDTA] for nurse aid when slot develops." During the time when this applicant was seeking employment through the Cleveland MSES office (1968–1975) she completed five full term pregnancies. She testified that during parts of the relevant time period she was earning about $25.00 per day hauling farm labor with her truck.

3. Mary Boyd, at the time of the events upon which her Title VII charge was based, was forty-nine years of age. Her education was at the sixth grade level. The "Adult Basic Learning Examination" administered to her revealed a reading level of fourth grade and math level of fourth grade. Her previous work history was in the field of farm work and housecleaning. Her type work preferred was "nurse aide training" or "cafe." She, too, had been referred to the STAR program to assist in removing her employment barriers, and participated in the program until it was terminated. In 1971 she was referred by the Cleveland MSES office to nurse aide training, and upon completion was referred to Community Hospital in Mound Bayou, where she was hired as a nurse aide.

4. Robert Williams, at the time of the events upon which his Title VII charge was based, was thirty-six years of age. His education was at the second grade level. The "Adult Basic Learning Examination" administered to him revealed a reading level of below first grade, and math level of second grade. His previous work history was tractor driving and other farm work. He, too, had been referred to the STAR program to assist in removing his employment barriers, and participated in the program until it was terminated.

None of the named plaintiffs who testified was able to cite any referral of a white or a male who was less qualified than they, or similarly qualified, to any job which

named plaintiffs believed they should have been referred to. The testimony of these plaintiffs showed that they were well aware of their employment barriers, and that they were making an effort to remove those barriers. Plaintiff Boyd testified that she had no objection to being classified or referred as a maid, and plaintiff Williams testified that janitorial type work was about all that he was capable of doing. In addition to the STAR training, defendants MSES also furnished other counseling and training opportunities to the named plaintiffs in an effort to prepare them for entry into the Bolivar County job market at the highest level for which they might be qualified. On or about February 27, 1970, named plaintiffs filed Title VII charges against MSES, charging discriminatory service to them.

None of the plaintiffs who testified had any dealings with defendants Lindsey or Aldridge, or knew who they were.

B. *Members of Plaintiff Class.*

Testimony was taken from some seventeen other black applicants, male and female, who were seeking employment and who sought the services of the Cleveland MSES office toward that end. These witnesses, with varying qualifications, were rendered various services by the Cleveland MSES office. There was no credible testimony from these witnesses that any white, or male, job applicant less qualified, or similarly qualified, was referred to any job which these members of the plaintiff class believed they should have been referred to. There was evidence of referral to Baxter Laboratories, as well as to other desirable employers, and evidence of various other appropriate services rendered by the Cleveland MSES office to this group of plaintiffs. Some did not respond to MSES "call in cards", and their applications were inactivated pursuant to Employment Security Manual provisions.

One of these witnesses, Adeline Ward Brown, who complained that she was classified in a code for domestic maid was referred to a job at Baxter Laboratories a

week later. The use of one classification would not prevent the referral to a job in another code, if such a suitable job became available.

Testimony on behalf of plaintiffs relating to services rendered to black and female applicants dealt with various individual complaints, and surmised that better service should have been rendered to them.

### C. Plaintiffs' Statistical and Expert Evidence.

Plaintiffs, through the pretrial discovery process, were afforded a great number of documents by both state and federal defendants. They were also furnished a massive amount of factual information by way of answers given to interrogatories propounded to the defendants.

Based upon the information secured through the sources just mentioned plaintiffs prepared a detailed computer printout to summarize the information obtained so as to present the same to the court in understandable form. The printout was used as a basis for the preparation of charts and schedules by plaintiffs for presentation as evidence to the court.

From the information obtained at the pretrial stage by the parties, a stipulation was prepared and furnished the court at trial. The instrument contained a list of approximately 109 stipulations of fact which the parties agreed would not be controverted.

Using this wealth of material, plaintiffs' analyst prepared numerous charts which were alleged to contain evidence of discrimination on the basis of race and sex by the state and federal defendants in the processing of applications for referrals and in making referrals on job orders at the Cleveland MSES office.

Based upon the charts and information of record, plaintiffs' experts opined that the named plaintiffs and members of the class had been and were being discriminated against on the basis of race and sex by defendants through the Cleveland MSES office in processing applicants for job refer-

rals and in making referrals on job orders received from prospective employers.

For the reasons hereinafter given, the court finds that the testimony of the experts and analyst introduced by plaintiffs, was not sufficient to support plaintiffs' burden of proof on the issues involved.

### V. The Defendants' Evidence.

### A. Operation of the Cleveland Office of MSES.

### 1. Service to Applicants.

Ernest C. Lindsey, the manager of the Cleveland office since 1968, and a defendant in both his official and personal capacity, was called by the plaintiffs as an adverse witness. He testified at length and in considerable detail, on cross-examination and later on direct, about the operations of his office and the procedures that are used to serve the job applicants who come into that office. These procedures are for the most part performed pursuant to the Employment Security Manual, a detailed guide to the operation of the local office. The services rendered to the job applicant may be summarized as follows:

The applicant is greeted by the receptionist, who, after initial interview, refers him to the interviewer who handles the Dictionary of Occupational Titles [DOT] job code families which appear to be of principal interest to the applicant. The applicant completes his application form [No. 511] with assistance as necessary from the interviewer. A copy of the form appears as an appendix hereto. A dialogue ensues between the applicant and the interviewer for the purpose of developing all available information that is pertinent to determining the applicant's training, skills, work experience, education, interests, preferences, availability, and aptitudes, so that a satisfactory classification or coding can be made, within the framework of the 20,000 job codes contained in the DOT, and also within the framework of the jobs that are available in the area served by the Cleveland office. The occupational code is a nine-digit designation. Other services rendered included counseling, when an applicant is un-

certain of his areas of interest, or otherwise appears in need of further assistance in his job search, and referral to training in an appropriate case. The office also has available in its Career Development Unit the CETA, Comprehensive Employment and Training Act, and WIN, Work Incentive Program, services for those who are eligible for those special programs.

The basic function of the local office is to match people with jobs. The two aspects of the function are to attempt to refer the applicant to the best available job for which he is qualified, and to refer on a job order the best qualified applicant available. The Cleveland office is limited in its performance of that function by the fact that the only jobs with which it can match applicants are those contained on job orders placed with it by employers in the community. The Cleveland office's share of the total job market is predominantly rural. Bolivar County is a small percentage thereof. [See State Defendants' Exhibit 32.] Another limitation on its performance of that function is the great imbalance between the number of job applicants and the number of job openings listed with the Cleveland office at any given time. Mr. Lindsey estimated this ratio to be about 5 to 1. Another limitation is the mandated Veterans' Preference which MSES follows in its referrals.

MSES uses only those tests which have been approved by the Department of Labor, and only in accordance with the instructions of the Department of Labor.

Testimony by Mr. Lindsey based on random examination of referrals on job orders disclosed that referrals on various jobs, including the most desirable and best paying, were made without regard to the race or sex of the applicants referred.

### 2. The Taking of Job Orders.

The interviewer obtains from the employer who wishes to place a job order with the MSES office the necessary information to complete the job order form [No. 514]. A copy of the form appears as an appendix hereto. The form includes all pertinent information available that will assist the interviewer in filling the order, including the details of the job's requirements and the employer's education and experience requirements for the job. A DOT code is arrived at for the job. This number classification is the nine-digit code from the Dictionary of Occupational Titles referred to above, and is used in the process of matching applicants with jobs.

### 3. EEOC and Civil Rights Law Compliance in Bolivar County.

The Cleveland office from the time of the passage and implementation of the Civil Rights Act of 1964 took steps to assure that its employees were aware of the provisions of the Act insofar as it applied to the operations of that office. Such steps included the signing of a log by all employees that they had read and were familiar with those provisions, use of self-study packages, development and use of a practical Training Unit, regular self-appraisal study and reports, on-going emphasis at staff meetings, and periodic evaluation by the EEO officer of the Mississippi Employment Security Commission. Detailed procedures were developed for the investigation, reporting and processing of Title VII charges, and directives for the placement of posters, and other publicity, were complied with. Minority forums were held for the purpose of maintaining a good rapport with the local black community, and monthly "Opportunity News Letters" were distributed broadly in the black community of Bolivar County, keeping the community posted on the varied range of services available at the Cleveland office. The manager regularly gives talks in the community, particularly at schools and training sites, about the Job Bank Viewers, how to use them, and the opportunities for employment that they contain.

The regular self-appraisal and evaluation report [Form AP–3] referred to above was periodically completed with positive showings, from random samplings of applications and job order referrals, of services rendered to protected minorities. [See SD Exhibits 44–45].

The Cleveland office in following the various procedures for assisting applicants in their job search did not make any distinction between applicants because of their race or their sex. A large percentage of the clientele of this office were members of the black race, and the employees of the Cleveland office performed their duties, within the limitations mentioned above, for all applicants on the same basis—that is, treating each applicant as an individual, different from every other individual, in his training, work experience, aptitudes, education, job preferences, and availability.

From 1965 until the present, there have been 30 black employees in the Cleveland office, with job titles ranging from Farm Placement Representative to Employment Interviewer. At the present time, out of a total staff of 11 persons, 4 are black. Their job titles are Employment Interviewer II [two with this title], Employment Interviewer I and Employment Security Aide III.

With the scarcity of job openings on file in the Cleveland office, the MSES employees in that office did what they could by way of classification and referral to try to help the applicants obtain whatever suitable work might be available, without regard to the applicant's race or sex.

### B. State Defendants' Witnesses.

1. Testimony of Evelyn Lyon, longtime employee in the Cleveland MSES office, was to the effect that as Supervisor of the Career Development Unit in that office her primary responsibilities were to advise and counsel with those individuals who were eligible to participate in such special federal programs as CETA and WIN, and that her clients were predominantly black. She related several instances of such services rendered, which plainly showed exemplary attitude and service, without regard to race or sex of the individual client. She also testified about the counseling services rendered in the Cleveland local office, and its use as an employability development tool. She testified also as to the high rate of "positive terminations" for blacks in the CETA program.

2. John E. Aldridge, former executive director of MSES, and a defendant in both his official and individual capacities, testified as to the administrative procedures adhered to during his tenure in office, and particularly the lines of communication and lines of authority from his office down to the local office manager's level. He testified that at all relevant times the various directives from DOL were implemented and properly disseminated to the field, and that diligent efforts were made to comply with the requirements of the Civil Rights Law of 1964, to assure that all services rendered by MESC were without regard to race or sex.

3. Reverend J. Y. Trice and Calvin Jones, both educators and leaders in the Bolivar County black community, testified as to the excellent rapport and reputation for good service enjoyed by the Cleveland MSES office in that community. They also related instances of such good service with which they were personally familiar. They further testified as to the high black unemployment rate in Bolivar County, and the high incidence of unskilled black labor in the County, and that with the applicant-job opening ratio being what it was, they believed the Cleveland MSES office was doing the best it could to help blacks find employment.

4. There were five black job applicants who testified for the state defendants, and related the good and productive services that had been rendered for them. They were Richard Collins, Lillie Mae Edwards, Elexo Warren, Mary Causey, and Marilyn Patton. They testified that their advice to a friend seeking work would be to consult the Cleveland MSES office for help. These witnesses were sincere and credible, and their testimony revealed what may be considered typical service rendered without regard to race or sex.

5. George Nash, a black employee in the Cleveland MSES office, presently contract writer with additional duties as employment interviewer, testified at length about his duties as well as the procedures followed in the Cleveland office in serving an appli-

cant who comes in—from his reception at the front desk, to the final interview, and referral to a job—with reference to the applicable Employment Service Manual provisions followed. His testimony paralleled that of Ernest Lindsey in many respects. He has been with MESC for about eleven years, and previously held positions of CEP outreach worker, and employment interviewer.

6. Don Drane, presently manager of the Greenville MSES office, testified as to his earlier employment at the Cleveland office when he worked with the named plaintiffs in the CEP program. He identified certain of the CEP and STAR records pertaining to those individuals, and testified as to the purposes behind the CEP, STAR, and related programs, and the strong efforts made by the Cleveland MSES office to help the participants or enrollees in those programs to remove their employment barriers, and obtain productive employment.

7. Louis Beverly, the MESC EEO Officer, and a black, testified concerning the duties of his office, and particularly about his observations and evaluations of the Cleveland MSES office over a period of years. He has served in this position since 1972. He reviewed several evaluation reports which he had made on that office, and related his conclusions as to the positive, ongoing efforts which have been and are being made there in service to applicants without regard to race or sex. [See S–D Exhibits 56, 57, and 80.]

8. Charles Ballard, Assistant Director, Employment Service Division, who has been with MESC for over forty years, testified about the relationship between the Department of Labor and the MESC, and the Employment Security Manual and its directives for local office operations. His testimony further covered the period of time when he was Chief of Programs & Methods Department for MESC, when in that capacity his department supervised the administration of tests. His testimony was that the Cleveland MSES office at all times complied with DOL directives and procedures in the use of tests. He further testified that

if there was ever any doubt about the appropriate use of a test, his department would always clear it with the DOL before going ahead with such use.

C. *The Relationship of State and Federal Defendants.*

1. The Mississippi State Employment Service (MSES) is a division of the Mississippi Employment Security Commission. MSES is a State operated employment service within the system of State and local employment services receiving Federal assistance under the Wagner-Peyser Act, 29 U.S.C. § 49–49K. MSES maintains and operates employment agencies throughout the State.

2. Under the system of "cooperative federalism" envisioned by the Wagner-Peyser Act, the Secretary of Labor makes grants to pay the administrative costs of operating State Employment Service Agencies. The various State agencies are created by the State law and are operated as agencies of State government. Through his authority as grantor of the funds for the state agencies, the Secretary of Labor exercises general supervisory authority over these State employment services. The Secretary of Labor prescribes the general policies under which the State employment service agency performs its functions. Particularly in the field of client service at the local office area, Federal policy provides for wide flexibility and discretion to State personnel in the performance of their duties.

3. Section 602 of the Civil Rights Act directs Federal departments and agencies empowered to extend Federal financial assistance "to any program or activity, by way of grant, loan, or contract" to effectuate the purpose of the Act by issuing implementing rules and regulations. The Secretary of Labor on December 4, 1964 published implementing regulations applicable to the Employment Service as well as other departmental programs in the Federal Register (at pp. 16284–16287 as Part 31 of Title 29 of the Code of Federal Regulations). Implementing instructions were also incorporated in the Employment Security Manu-

al (ESM) Part II Sec. 1294. (FD exhibit 51).

4. The Secretary of Labor also issued to all State employment security agencies, including MSES policies and instructions designed to forbid and avoid discrimination in referral, classification or testing and these policies and the instructions are legal and effective. These policy statements include:

(a) General Administration Letter 833, December 31, 1964, Nondiscrimination in Federally Assisted Programs of the Department of Labor—Effectuation of Title VI of the Civil Rights Act of 1964—with attached copy of 29 C.F.R. Part 31. (FD Exhibit 7).

(b) United States Employment Service Program Letter 1919, November 9, 1965, Employment Practices under Title VII of the Civil Rights Act of 1964. This order superseded any conflicting instructions in the Employment Service Manual (ESM) with respect to implementation of Title VII of the Civil Rights Act of 1964. Its purpose was to discontinue the noting of sex and age specifications in Job Bank Job Order listing. (FD Exhibit 9).

(c) General Administration Letter 1054, February 1, 1967, Conformance with the Provisions of Title VII of the Civil Rights Act of 1964 which Prohibits Sex Discrimination in Employment and Training Programs. Its purpose was to assure full compliance with the sex discrimination provisions of Title VII of the Civil Rights Act of 1967. (FD Exhibit 17).

(d) Training and Employment Service Program Letter 2582, October 9, 1970, Discriminatory Specifications on Job Bank Job Order Listings. Its purpose was to discontinue the noting of sex and age specifications in Job Bank Job Order listings. (FD Exhibit 11).

(e) Training and Employment Service Program Letter, December 27, 1971, Elimination of Comments on Personal Traits and Characteristics on Application and Order forms, instructed State agencies to eliminate and delete all comments on personal traits and characteristics on Application Forms, ES–511 and Order Form, ES–514 since they can be unfairly discriminatory. (FD Exhibit 13).

(f) U. S. Employment Service Program Letter, 2698, May 17, 1966, Guidelines on Sex Discrimination Provisions of Title VII of Civil Rights Act of 1964. Disseminated additional information on the guidelines concerning the sex discrimination provisions of Title VII and attaching EEOC guidelines on sex discrimination. (FD Exhibit 15).

(g) General Administration Letter 1466, July 5, 1972, EEO Guidelines on Discrimination Because of Sex. To inform State agencies of the New EEOC Guidelines on Discrimination Because of Sex. (FD Exhibit 19).

(h) Training and Employment Service Program Letter No. 2756, Proper Use of General Aptitude Test Battery (GATB), in Counseling and New Policy on Use of Specific Aptitude Test Battery (SATB) in Selection. To reemphasize the need for careful interpretation of GATB test results in counseling particularly when working with minority group applicants and to issue a new interim referral policy to assure that minority group applicants are not discriminated against in testing and selection for referral to jobs. (Stipulation Exhibit 56).

(i) Training and Employment Service Program Letter No. 2756, Change 1; issued a list of SATB's that may be used in selection in accordance with standard Employment Security Manual procedures. (Stipulation Exhibit 57).

(j) General Administration Letter No. 18–79 Uniform Guidelines on Employee Selection Procedures (1978), transmitting the Guidelines and to provide information on the implementation of the Guidelines. (FD Exhibit 54).

5. State Employment Service Agencies are required to follow the policies stated in the Employment Security Manual (ESM). The purpose of the ESM is to set the minimum standards for operating the State employment services. 29 U.S.C. § 49b. These standards can be altered or expanded to fit the State's particular labor market.

The States have flexibility in running their employment services provided they do not violate Department of Labor policies or operate below the minimum standards as set forth in the ESM or instructions. (FD Exhibit 51 unless otherwise noted.) Those policies include:

(a) The classification of an applicant in terms of the Dictionary of Occupational Titles (DOT) on the basis of an evaluation of all occupational qualifications as shown by work experience, training and personal characteristics; not to extend preference to any applicant or group, except in accordance with legal requirements and to ensure, as far as practicable, that applicants suitably qualified for job openings are referred to employers. ESM Part II, § 1005.

(b) The application process as a part of the placement process in which the interviewer reviews, analyzes and completes information on applicant qualifications, determines the need for counseling and gives the applicant information which may increase his or her opportunities for placement. ESM Part § 1010.

(c) Work experience as a major source of an applicant's occupational qualifications. It is essential for the interviewer to consider all significant variable factors. ESM Part § 1066.

(d) Personal characteristics, including vocational interests and preference, must be considered in determining occupational qualifications in addition to information on work experience and training. ESM Part II § 1070.

(e) Interviewers explain to the applicant the various occupational codes (DOT) for which they qualify and ask them to state occupational preferences. When the applicant's preferred occupational code is not assigned, justification of the assignment should be noted on the application card. ESM Part II § 1090.

(f) Interviewers explain the method of operation of the local office so the applicant understands the method of selection, and explains the meaning of any occupational title and skills if requested by the applicant. ESM Part II, § 1100.

(g) The interview for the assigning of occupational (DOT) classifications of applicants is a fact finding process. Occupational classification shall be assigned solely on the basis of factors bearing on job performance and no classifications shall be made on the basis of or influenced by race, creed, color or national origin. ESM Part II, § 1190.

(h) In making an occupational classification the interviewer evaluates evidence of an applicant's qualifications, determines a specific job or jobs or fields of work to which significant evidence points and compares the skills, knowledge and the ability of the applicant with the code requirements. The interviewer discusses the possible classifications with the applicant. ESM Part II, § 1191.

(i) An interviewer should rarely consider personal characteristics alone. However, with inexperienced applicants an interviewer may be forced to consider personal characteristics such as personal status, aptitudes, personal traits and vocational interests. ESM Part II § 1198.

(j) The interviewer in consultation with the applicant develops one or more occupational codes and picks one as the primary code. Where opportunities for employment are limited the interviewer insures that there is at least one additional classification for which there is a specific or general opportunity for work. ESM Part II § 1203.

(k) The interviewer informs the applicant of all codes assigned to him or her. In some cases, this discussion will bring to light any conflicts over the assignment of codes. ESM Part II § 1205.

(*l*) Job opportunities for unskilled workers may be increased by the use of summary job code groups. This technique consists of grouping related processes or functions which normally require familiarity with the industrial or occupational environment but in which specific experience requirements do not justify a full five or six digit code. The Mississippi Employment Service Manual does not contain a similar section. ESM Part II § 1225.

(m) Order taking is the process the interviewer uses for gathering information about the job from the employer for referral purposes. The nature of the job may be such that the interviewer may gather the necessary information about job content and worker qualifications by means of an interview with the employer. Other jobs may be sufficiently complex that information is more effectively obtained by actual observation of the job. ESM Part II § 1250.

(n) The local office is prohibited from processing job orders that are contrary to Federal, State or local laws. ESM Part II § 1290.

(o) The local office is prohibited from processing employer job orders where there is evidence or information that the employer discriminates by race, color or national origin. Any employer specifications that result in the exclusion of applicants of a particular race, color or national origin are discriminatory even though the employer specifications are not expressly discriminatory. Although this section does not list every conceivable form of discrimination the instructions are sufficient to put local offices on notice of the types of discrimination that may exist. ESM Part II § 1294.

(p) The selection of applicants for referral involves a 3-step process: determining performance/non-performance job requirements, accurately determining applicant qualifications and preferences, and a point by point comparison of qualifications and job requirements. ESM Part II § 1450.

(q) In selecting applicants for referral the interviewer must beware of hiring requirements which may have little or no relation to work performance requirements. ESM Part II § 1461.

(r) The interviewer, in making a referral, should consider the factors influencing the applicant's acceptance of the referral. The vocational interests and substantiated interests of the applicant deserve careful consideration in deciding the appropriateness of the job referral. ESM Part II, § 1507.

(s) Since applicants rarely exactly meet all of an employer's requirements, the interviewer should discuss the applicant's qualifications with the employer in order to effect a compromise such that the employer will relax non-performance requirements in favor of otherwise acceptable applicants. ESM Part II § 1508.

(t) The local office cannot make referrals on orders containing discriminatory specifications with respect to race, creed, color or national origin. ESM Part II, § 1650.

(u) Employment service local offices should give necessary emphasis and attention to carry out employment service functions, including relations with minority applicants, employers and the community in such a manner as will best promote nondiscriminatory employer employment practices. ESM Part II §§ 8100–8170. (FD Exhibit 52).

(v) The objective of the employment service in providing services to women is to assure that they are given equal consideration for employment opportunities and any other needed services. Job classifications should be made to provide maximum exposure to job openings, and special care should be taken to avoid placing her in stereotyped categories associated with women. Local offices are prohibited from processing job orders that contain unlawful sex specifications. ESM Part II §§ 8710–8739. (FD Exhibit 32.)

6. The system outlined in the ESM contemplates an objective, nondiscriminatory evaluation of an applicant's skills, abilities and preferences and a job related analysis of the employer's needs. Nonetheless the system depends on the skills, judgment and attitudes of each local office interviewer. The system allows an interviewer flexibility in matching applicants with job opportunities based upon job related factors. Neither federal nor central state authorities can exercise complete control over the one-on-one relationship at an employment service interviewer and an applicant or an employer.

D. *Statistical Expert Evidence.*

The State Defendants introduced an expert witness to present their statistical analysis of rate of referrals for job applicants and the average rate of salaries of those job referrals.

The Federal defendants introduced expert evidence to support the validity of tests prepared by MSES for use by the Cleveland office in making job referrals of job applicants.

### VI. *The Battle of the Analysts and/or Experts.*

### A. *Plaintiffs' Analytical and Expert Evidence.*

Plaintiffs' analyst prepared from the statistical evidence obtained for use at trial certain exhibits and charts.

Relying upon the premise that all available and material factual and statistical information had been obtained and presented to plaintiffs' analyst for her consideration in preparation of exhibits and charts and the accuracy of her analysis thereof, plaintiffs' experts concluded that those in charge of the Cleveland office and responsible for the referral of job applicants on job orders were guilty of discriminating against plaintiffs and members of the class on the basis of race and sex.

Dr. James L. Outtz, an expert in Testing and Industrial Psychology, testified for plaintiffs. He based his conclusions primarily on plaintiffs' Exhibits 145, 163 and 127 and Stipulation paragraph 78.

At trial, the Federal Defendants presented a motion to dismiss the action as to the Federal Defendants. The motion was premised on the proposition that the evidence presented by plaintiffs upon which Dr. Outtz based his opinion was not sufficient to support his conclusions.

Plaintiffs' Exhibit 163 is a chart prepared by MSES showing test results on specific aptitude test batteries administered by the Cleveland office in 1971. From this data, plaintiffs developed their Exhibit 145 which arrays the same information and adds to it a calculation of the percentage of persons with scores below norm, a percentage which

they characterize as the percent of people who failed the examination or test. Dr. Outtz analyzed the percentages found in the percent failed column in Exhibit 145 to reach the conclusion that there was statistical adverse impact. Dr. Outtz did not independently know which persons fell in the column headed "Number With Scores below Norm."

The record reflects that the chart included in plaintiffs' exhibit 163, was prepared by David Morris. Mr. Morris included in the figure given in the "below norm" column those persons taking the test who scored either "M" or "L". The figures used by Dr. Outtz from plaintiffs' exhibit 163 in the "below norm" column does not identify those who failed the test. For an explanation of letter grades H, M and L, see *infra*.

The Federal defendants concluded that since it was possible that all or most of the people with scores below the norm received the letter grade M and could have been in the pool of people referred, calculations based upon the chart in Plaintiffs' Exhibit 163 cannot show adverse impact.

Plaintiffs' Exhibit 127 purports to show a different rate of referral for blacks or whites of persons coded in the nurse aide code who were referred to a nurses aide training program. The evidence reflected that Dr. Outtz did not know how many if any of those persons were test selected. In the absence of such information, the Federal Defendants argue that this exhibit cannot demonstrate adverse impact in fact in terms of test selection.

Stipulation paragraph 78, contains a chart of racial differences on scoring on various aptitudes of the general aptitude test battery (GATB). Federal Defendants contend that since no evidence was presented to demonstrate any impact of any tests in the Cleveland office, the information contained in Stipulation Paragraph 78 does not prove anything.

The motion to dismiss made during the trial, was briefed by the parties on one-day notice. After having given due consideration to the matter, although impressed with

the validity of the position asserted by the Federal defendants, the court elected to overrule the motion in favor of finishing the trial and deciding the action on the merits.

The Federal Defendants have filed a post-trial motion to dismiss or for summary judgment for failure to make a prima facie case of adverse impact. The motion presents the same issues included in the Federal Defendants' motion to dismiss filed during the trial. The parties have submitted additional memoranda supporting their respective views.

The action has been tried in its entirety. The court concludes that the interest of all parties will be served by treating the post-trial motion as moot.

The court received other expert evidence in support of plaintiffs' position that the evidence as a whole sustained plaintiffs' charge of discrimination on the basis of race and sex by the Cleveland office.

Plaintiffs' expert evidence also attacked the validity of the tests promulgated by the Federal Defendants for use by MSES at its Cleveland office on three specific occupations—(1) table worker positions (S–28); (2) licensed practical nurses training programs (S–270); and (3) nurses aide training and jobs (S–282) and asserted adverse impact from use of the test on black applicants.

The discrimination in testing issue was the subject of extensive expert evidence introduced at the trial. Plaintiffs asserted invalidity of the tests and adverse impact of each upon the opportunities of members of the black race seeking employment through the facilities of the Cleveland office.

The Federal defendants defend the validity of the test through their own expert evidence and assert that proper validation procedures were taken on the test used in each of the occupations under attack.

B. *The Testing Issue.*

The court has tried the issues pertaining to the validation of the tests prepared by the Federal Defendants and used by MSES at its Cleveland office. From the evidence introduced, the court finds:

1. The United States Employment Service (USES) has developed the General Aptitude Test Battery (GATB) and the Specific Aptitude Test Battery (SATB) for use in the local employment service offices.

2. The GATB is composed of eight pencil and paper tests and four apparatus tests designed to measure the nine aptitudes found to be important for successful performance on various jobs. The nine aptitudes and tests are as follows:

G—Intelligence
 Part 3—Three Dimensional Space
 Part 4—Vocabulary
 Part 6—Arithmetic Reason
V—Verbal Aptitude
 Part 4—Vocabulary
N—Numerical Aptitude
 Part 2—Computation
 Part 6—Arithmetic Reasoning
S—Spatial Aptitude
 Part 3—Three-Dimensional Space
P—Form Perception
 Part 5—Tool Matching
 Part 7—Form Matching
Q—Clerical Perception
 Part 1—Name Comparison
K—Motor Coordination
 Part 8—Marking Making
F—Finger Dexterity
 Part 11—Assemble
 Part 12—Disassemble
M—Manual Dexterity
 Part 9—Place
 Part 10—Turn

The GATB was developed on the basis of a statistical analysis of 59 different kinds of tests which had been used in predicting performance in a wide variety of occupations. The nine GATB aptitudes were selected because they provide adequate measures of all the major abilities measured by the 59 tests. (Stipulation Exhibit 80, FD Exhibit 50, Testimony of John Hawk).

3. The GATB and Occupational Aptitude Patterns (OAP) are counselling devices and their use is governed respectively by § 9300 and § 4000 of Part II of the Employ-

ment Service Manual. These tools are not to override the individual's employment desires or job choices. The GATB or OAP are not at issue. (Stipulation exhibits 80 and 54, FD Exhibit 50).

4. The GATB was developed by the United States Employment Service (USES) and has been used since 1947 by State employment services. Since that time the GATB has been involved in a continuing program of research to validate the tests in many different occupations and to insure that the tests used meet professional standards and legal requirements. The USES has consistently used the best information available, at the time, to develop high quality tools to further the basic goals of the employment service. USES research is goal-oriented so research efforts have been almost entirely in the area of applied as opposed to pure research. Wherever possible the USES has applied techniques and procedures which have been developed by others and demonstrated to have utility. (Testimony of John Hawk.)

5. The SATB is a test battery consisting of 2 or more of the GATB aptitudes and is used as a measure of potential for success in a specific occupation.

6. Only the S–28, Table Work, S–270R Licensed Practical Nurse and S–282 Nurse Aid tests are at issue in this case.

7. Since 1967 the majority of USES research efforts have been the investigation of the impacts of its tests on minority groups. USES research staff was doubled in 1972 for this purpose. An enormous amount of information has been gathered on USES tests and, the general finding is that USDO1 tests are fair for minority groups. This also has been the finding of other investigations that have studied USES tests. (Testimony of John Hawk and Dr. John Hunter).

8. The use of the USES tests is governed by the Employment Service Manual, Part II §§ 9000–9999 and includes the following sections:

(Stipulation exhibit 54 unless otherwise noted.)

a. It is the policy of the USES to use objective tests and related techniques as needed in the operation of employment service counseling testing and placement programs. ESM Part II § 9001.

b. USES tests are developed to aid in the selection and referral of inexperienced, untrained and entry workers and under certain conditions for future promotion or transfer to more skilled positions. Applicants for specific occupations may be tested if the job order calls for workers with no previous experience in the job, newly recruited workers who will be provided on the job training or newly recruited workers are to be considered to promotions to other than entry level jobs.

c. Aptitude tests should not be used when the individual is experienced and has demonstrated proficiency in the occupation under consideration, the employers job order calls for specific work experience and aptitude test norms have not been developed for a particular occupation. There is no arbitrary or a priori choosing of tests and test scores. ESM Part II § 9157.

d. The application form of plaintiff Rebecca Gillespie indicates that she was given the nurse aid SATB although she was experienced as a nurse aid. (Stipulation Exhibit 8).

e. The interpretation of test scores is not a mechanical process. Although aptitude tests are more accurate in determining an applicant's qualifications than any subjective means, test results are only one factor in determining an applicant's fitness for specific job opportunities. Other factors to be considered are educational, special skills, knowledge and physical capacity. ESM Part II § 9319.

f. In interpreting test results the interviewer or counselor should assume that the individual tested has at least the amount of aptitude demonstrated in the test and possibly more. An applicant should not be excluded from consideration for a job or training on the basis of test results alone. If the applicant meets the other hiring specifications or training requirements, he or she may be referred

for consideration together with test selected applicants. ESM Part II § 9312.

g. The USES has provided State employment services complete instructions for the administration and scoring of the SATB and are contained in the Manual for the GATB and the ESM. ESM Part II § 9305. (Stipulation exhibit 80, and 54.)

9. The SATB is scored H, M, or L. There are no absolute pass or fail scores. The letter scores are interpreted as follows:

H—Meets or exceeds all of the norms for a particular SATB. An applicant receiving H is judged to be satisfactory for the job, if also qualified on the basis of factors other than aptitude and may be referred.

M—The obtained score plus one standard error of measure meets or exceeds all the norms for a particular SATB. M scores are close to those workers judged to be satisfactory and may be referred.

L—The obtained score plus one standard error of measure are below the requirements for "M". The chances of an applicant being satisfactory on the job are low. The applicant should be considered for other jobs which utilize stronger aptitudes. An applicant may be referred although if warranted by (1) factors other than aptitudes i. e., interests, training, experience, or motivation (2) local labor conditions requiring more than available H & M applicants (3) the employer has agreed to accept less competitive applicants as a result of job development. ESM Part II § 9312. (Stipulation exhibit 54, Testimony of John Hawk.)

10. USES deliberately set its cutting scores to "pass" at least ⅔ of those tested. Thus, instead of rejecting the vast majority of applicants, USES procedures insure that these applicants are given further consideration.

11. The "cut off" score for USES tests is set at a ⅔–⅓ level because USES experience over the years has been that ⅓ of employed workers are unsatisfactory; hence the ⅔–⅓ division was used in both the test scores and in the research sample. On any given job there is a range of performance from outstanding to very poor. What is acceptable performance is influenced by a host of factors including the perceived probability of hiring someone better than the worker in question. (Testimony of John Hawk and Dr. John Hunter.)

12. All applicants classified as "failing" in plaintiffs' exhibits 145 and 163 are, according to testimony and USDOL policy, eligible for referrals. A proportion of those "failing" actually scored "M" and received very nearly the same consideration as those "passing". (Stipulation exhibit 54, testimony of David Morris and John Hawk).

13. Racial bias on the part of raters has not been demonstrated to exist in either the specific USES research at issue or as a general case. The validities of the tests for blacks and whites are of similar (positive) magnitude and at a useful level. Plaintiffs have alleged that the validities of the test for the total research sample may be caused by racial bias on the part of the raters assessing job performance and different levels of performance of the test by racial group. This has not been demonstrated.

14. In its research the USES uses a variety of different criterion measures including supervisory ratings. The raters used for USES research were supervisors and had already spent a great deal of time in evaluating the performance of workers which is a significant job duty for supervisors. They are usually trained in performance evaluation by the employer. Raters are provided individual orientation, training and assistance when the ratings are obtained. Any question of rater bias is reported and data obtained from such a rater is not used. Plaintiffs have alleged that rater bias could have been reduced by training the raters. The record shows this is not the case. (Testimony of Herbert Campbell, John Hawk and Dr. John Hunter.)

15. Research has shown that ratings on specific behavior are not superior to the

type of ratings used by USES. Plaintiff's allegation that specific rating scales would reduce rater bias is without foundation. (Testimony of Dr. John Hunter.)

16. Empirical research has demonstrated that validity is not perceptibly changed by differences in location, differences in specific job duties or applicant populations. Valid tests do not become invalid when these circumstances change. Plaintiffs' allegation that validity is specific to a particular location, a particular set of tasks and to a specific applicant population, or in other words, that a valid test in one set of circumstances is not valid in circumstances not perfectly identical is not true. (Testimony of Dr. John Hunter.)[1]

17. No evidence was presented that USES ratings were based on irrelevant job duties or were not related to measuring job performance. The ratings used by USES were based on quality, quantity and accuracy of work, job knowledge and versatility, which are central and essential aspects of job performance. Plaintiffs' allegation that the validities found in research were spurious because the ratings may have been based on irrelevant job duties or were not "meaningful" is not true. (Stipulation exhibits 68, 69, 73, and Testimony of John Hawk.)

18. It is well known within the industrial psychological profession that restriction in range of the research sample produces an underestimation of the relationship found in the incumbent population from which the sample is drawn. Thus plaintiffs' allegation that the validity coefficients obtained were spurious because of restriction in the range of abilities in the research sample is without merit. (Testimony of Dr. John Hunter.)

19. Test fairness is evaluated in a number of ways. The USES tests used are fair. Thus plaintiffs' allegation that the wrong model of test fairness was used is without merit. (Testimony of Dr. John Hunter.)

20. It was demonstrated using well established techniques and conservative estimates that the reported validity of USES tests are underestimates of the validity which actually exists when the tests are used with applicants. It was also demonstrated that a very considerable dollar value is associated with the reported levels of validity. There is no truth to plaintiffs' allegation that the levels of reported validities are so low as to be of no practical value. (FD exhibit 60, Testimony of Dr. John Hunter.)

21. No differences between the job duties in the research sample and the jobs in Bolivar County were specified. According to research, even gross changes in job duties did not destroy validity. It follows that small and/or hypothesized differences have little or no effect on validity. Plaintiffs have not shown that the USES tests were invalid because the tasks of the jobs in the research setting may have been different from those in Bolivar County. (Testimony of Dr. John Hunter.)

22. USES' goal is to establish the best test battery possible, using the best available data, evaluated according to commonly accepted techniques. Batteries and cutting scores may vary from research sample to research sample because certain tests are "highly correlated", that is, measure similar aptitudes, and because cutting scores as well as the selection of individual tests for inclusion in a battery are developed to be the most fair to all subsamples. Thus, an individual test with a high validity coefficient may not be used in a final battery if another test produces better results for a minority subsample. Revisions of aptitudes and cutting scores are made when research demonstrates that a different battery is valid on the research sample and can be crossvalidated on previous samples. Plaintiffs' hypothesis that this demonstrates invalidity is simply without merit. (Testimony of John Hawk and Dr. John Hunter.)

1. The research done by Dr. John Hunter and his colleagues shows that the validity of tests is broadly generalizeable across jobs, geographical locations and applicant populations. In both the 1970 EEOC Guidelines and the Standards of the American Psychological Association such research has been called for.

23. The EEOC Guidelines on Employee Selection Procedures in effect at the time of the alleged discrimination are controlling.

24. The United States Employment Service (USES) tests meet all of the applicable EEOC guidelines for test usage and validation.

(a) Section 1607.1(b) has been met. Section 9012 of the Employment Security Manual (ESM) prohibits the use of test scores as the sole basis for making an employment decision. The USES never uses tests without evidence of validity, ESM Part II §§ 9103B, 9157(A)(6).

(b) Section 1607.3(a) has been met. The USES tests have been validated and evidence a high degree of utility. (SATB technical reports for S–28, Table Worker, S–282 Nurse Aide, and S–27 Licensed Practical Nurse, testimony of John Hawk and Dr. John Hunter.)

(c) Section 1607.3(b) has been met. USES policy precludes the use of tests developed by others. ESM Part II § 9001B.

(d) Section 1607.4(a) has been met. The USES technical reports contain evidence of validity for the S–28, S–282 and S–270R tests. (Stipulation Exhibits 73, 69, 68.)

(e) Section 1607.4(c) has been met. The technical reports contain empirical data demonstrating that the test is correlated with important job elements. State agencies are required to have on hand, as evidence of validation, copies of the technical reports for test batteries used in selection ESM Part II § 9160. (Stipulation Exhibit 54.)

(f) Section 1607.4(c)(1) has been met. Differences in location, jobs and applicant characteristics do not alter the proper interpretation of validity evidence. Further, no credible evidence exists that differences between units, jobs and applicant populations alter test validity. (Testimony of Dr. John Hunter.)

(g) Section 1607.5(b)(1) has been met. No evidence was presented that any of the samples are atypical or unrepresentative. Differences in applicant characteristics do not moderate or change validity. (Testimony of Dr. John Hunter.)

(h) Section 1607.5(b)(2) has been met. USES tests are administered and scored under controlled and standardized conditions. (Manual for the GATB, Sections II Stipulation exhibit 80.)

(i) Section 1607.5(b)(3) has been met. The SATB technical reports fully describe the criteria used in evaluating worker behavior. In the case of rating techniques the appraisal forms and instructions to the raters are included. (Stipulation Exhibits 66–79.)

(j) Section 1607.5(b)(4) has been met. The supervisory rating scale used by USES has been carefully developed. The ratings are carefully evaluated for any evidence of bias. Any ratings where there is even a slight chance of bias are excluded from the study. (Testimony of John Hawk and of Herbert Campbell).

(k) Section 1607.5(b)(5) has been met. The USES has conducted differential validity research. The USES has assessed the validity of its tests and the tests are shown to have positive correlations between criteria and test scores that are statistically significant for minority subsamples. In addition to the statistical significance the USES tests have practical significance and a high degree of utility. (Testimony of Herbert Campbell and Dr. John Hunter.)

(*l*) Section 1607.6 has been met. The SATB technical reports include graphic and statistical representations of the relationship between the test and the criteria. The average scores for all tests and criteria is reported for all subgroups. Cut off scores were set much lower for these tests than usual. The reason for this is to allow a greater number of test-takers to pass. (Testimony of John Hawk.)

(m) Section 1607.7 is not applicable since the Department of Labor uses only validation studies it has performed. ESM Part II § 9159 (Stipulation exhibit 54).

(n) Section 1607.8 has been met. There is no assumption of validity of USES tests. The tests are validated in accordance with

these guidelines and the American Psychological Association standards. ESM Part II § 9160A. (Stipulation exhibit 54.)

(o) Section 1607.9 has been met. All the SATB's used are supported by empirical research which provides substantial evidence of validity. All of the SATB's in this case have been or are in the process of being revalidated with substantial minority subsamples. (Testimony of John Hawk, Stipulation exhibits 66–79.)

(p) Section 1607.10 has been met. USES aptitude tests are to be used for referral purposes only for occupations for which the tests have been validated. Only USES tests are to be used by local employment service offices for referrals. ESM Part II §§ 9150, 9160. (Stipulation exhibit 54.)

(q) Section 1607.11 is not applicable since there is no evidence of disparate treatment with respect to testing.

(r) Section 1607.12 has been met. Where conditions exist that may have affected test scores applicants shall be retested as soon as practical with an alternate form of a proficiency or aptitude test. ESM Part II § 9015 (Stipulation exhibit 54.)

VII. *Conclusion.*

This is not an ordinary racial and sexual discrimination in employment action. Plaintiffs charge defendants with the operation of the Cleveland office of MSES in such manner as to discriminate against them and the class members in employment opportunities on the basis of race and sex.

The court holds, based upon the evidence introduced at trial, that those in charge of the Cleveland office, including defendants Aldridge, Lindsey and the United States Department of Labor, have demonstrated to the satisfaction of the court a concern for plaintiffs and members of their class, and have used all reasonable diligence to afford them with equal opportunities in employment.

Plaintiffs' statistical evidence did not and could not take into account the human elements involved in affording a job applicant an opportunity of gainful employment. These elements cannot be inserted into a computer in such manner as to play a part in affording a printout which reveals a true statistical analysis of the problem. The evidence also reflects that all of the relevant and available information was not reflected in the charts and schedules presented for use in the presentation of plaintiffs' case.

This court tried the *Payne* case (*Payne v. Travenol Laboratories, Inc.*, 416 F.Supp. 248 [N.D.Miss., 1976] *aff'd in part, rev'd in part on other grounds*, 565 F.2d 895 [5th Cir. 1978]), which pertained to employment practices at the Cleveland plant of Travenol Laboratories, Inc. One of the issues in *Payne* was the use by Travenol of a tenth grade or its GED equivalency educational requirement for all operative jobs in the plant. From February, 1965 until the fall of 1971, the Cleveland office processed job orders from Travenol. These orders required that the job applicant possess a tenth grade education or its GED equivalency. The Cleveland MSES office declined to refer an applicant to Travenol who did not meet the educational requirement.

In *Travenol* the court held that the said educational requirement was not shown to be job-related and a result of its application was to discriminate against black job applicants. *Payne v. Travenol, supra,* at 257, et seq.

The evidence before the court in the action sub judice shows that in 1970 or 1971, the Cleveland office discontinued the acceptance of job-orders from Travenol which contained the Tenth Grade of its GED Equivalency requirement.

The practice of the acceptance of job-orders from Travenol prior to 1971 containing the educational requirement aforesaid, served to discriminate against black applicants. This practice was discontinued, however, before the filing of the complaint herein. The court finds that any misuse of the Travenol job-orders, prior to the institution of this action, does not support any relief herein for plaintiffs or members of their class.

When the evidence is considered as a whole, the court has concluded that plain-

tiffs have not shown by a preponderance of the evidence that they and the members of the class represented by them, have suffered, or are likely to suffer discrimination on the basis of race or sex at the hands of defendants or any of them.

On the issues involving the Federal Defendants, the court finds:

■ 1. There is no evidence that the SATBs were used in any manner that adversely impacted on blacks or women. The plaintiffs failed to make a showing of adverse impact of the SATB on minority groups.

2. Not all selection procedures are unlawful. The Supreme Court recognized this in *Griggs v. Duke Power Co.*, 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158 (1971) where it said "[N]othing in the Act precludes the use of testing or measuring procedures; obviously they are useful."

3. The procedures for validation and standards for use of USES tests conform to the Standards for Educational and Psychological Tests and Manuals issued by the American Psychological Association, and the Guidelines on Employee Selection Procedures published by the Equal Employment Opportunity Commission (EEOC) on August 1, 1970, in the Federal Register (Volume 35, No. 149), the test validation

guidelines in effect at the time of the alleged discrimination.

4. Tests may be validated by properly conducted empirical research. In many cases tests have been held invalid when they have not been empirically validated or when a validation study was an ad hoc, after the fact, attempt to validate a testing program already in use. *See, Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *U. S. v. Georgia Power*, 474 F.2d 906 (5th Cir., 1973). It was shown by testimony and documentary evidence that the USES has had since 1947 an extensive and ongoing research program of test development validation.

5. The SATB's used by the Cleveland local office were properly validated and did not unlawfully discriminate against minorities. *Jackson v. Nassau County Civil Service Commission*, 424 F.Supp. 1162 (E.D. N.Y., 1976); *Friend v. Leidinger*, 588 F.2d 61 (4th Cir. 1978).

The court, having found that plaintiffs are not entitled to any relief against any defendant herein, directs the clerk to enter final judgment on the complaint, as amended, in favor of all defendants, and final judgment on the third-party complaint in favor of the third-party defendants. The defendants and third-party defendants shall recover their costs as provided by law.

APPENDIX A

| 54. | SERVICES RENDERED AND/OR ACTIONS TAKEN | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DATE | | | | | | | | |
| METHOD | | | | | | | | |
| Called | Referred | J.D. | Couns. | Form No. & Initials | ACTION TAKEN - EMPLOYER & JOB TITLE | Result | REMARKS | Init |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

## APPENDIX A—Continued

DO NOT WRITE BELOW THIS LINE

| 1. Last Name | First | Middle Initial |
|---|---|---|

| 2. No. and Street Address, Route or P. O. Box No. | 3. Telephone Number |
|---|---|

| 4. City | State | 5. Zip Code |
|---|---|---|

6. Give Directions to Your Home

| 7. Social Security Number | 9. Sum. Youth | 10. Sex | 11. Date of Birth (Mo. Day Yr.) | 12. Grade | 13. Mo. Exp. |
|---|---|---|---|---|---|

14. School Last Attended

| Name | Location | Year | Degree |
|---|---|---|---|

15. Current Military Status

Type of Discharge

Period of Service. From _____ To _____

| 16. Family Information | 17. Ht. | 18. Wt. | 19. Union Status |
|---|---|---|---|
| ☐ Married ☐ Separated<br>☐ Single No. Dependents _____<br>☐ Widowed No. Needing<br>☐ Divorced Child Care _____ | Ft. In. | Pounds | Name _____<br>Local No. _____ |

20. Transportation

Do you have – Auto? _____ Drivers License? _____ Regular ☐ Commercial ☐

21. Type of Work Preferred

22. List Other Types of Work You Will Accept

| 23. Occupational Title | | Code |
|---|---|---|

| 24. Location & Salary Minimum | 25. Employer(s) |
|---|---|
| ☐ Local $ _____ ☐ Miss. $ _____<br>Other _____ | |

| 26. Co | 27. R/E | 28. WT'S | 29. H'cap | 30. Vet | 31. O.V. & O.T. | 46 Date Mo. Day Yr. |
|---|---|---|---|---|---|---|
| 32. Disad. | 33. Wel | 34. I-S | 35. STW /Migt. | 36. Emp. Status | 37. Clmt. | |
| 38. CETA | 39. Tests | 40. TD | 41. U.S. Citizen | 42. | 43. | |

44. Skills, Knowledges and Abilities

45. Comments on Availability

MSES 511 (R-10/78) APPLICATION CARD

## APPENDIX B

### JOB ORDER FORM

| 1-7 Order No. | 8-16 DOT Code | 17 18 19 20 41 CC 02 TC 2 Employer or Occupational Job Title |
|---|---|---|

**0585501**

| 17-18 19 20-39 CC 01 TC 2 Employer Name | 42-61 Whom to See |
|---|---|

| 40-59 Employer Street Address | 62-71 Telephone No. | Ordered By | Order Time |
|---|---|---|---|

| 60-69 City | 70-71 State | 72-76 Zip Code | 77-79 Cnty. | 80 4 | 72-79 Federal Use | 80 4 |
|---|---|---|---|---|---|---|

| 17-18 19 20-25 CC 03 TC 2 Order Date Mo. Day Yr. | 26-29 Lcl. Off. No. | 30-33 Sta./Dsk. | 34 35 36-39 Cnt/Clr SIC Code | 40 O.S. | 41-43 Delay Verif. | 44-46 Open. | 47 Source | 48-50 Refer. | 51 Duration |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 1. ___ J.D.<br>2. ___ Mandy.<br>3. ___ J.D. & Mandy. | | 1. ___ 1-3 days<br>2. ___ 4-150 days<br>3. ___ Over 150 days |

| 52-58 Pay | 59 Pay Unit | 60-61 Hrs. Worked Per Week | 62-63 Exp. (Mos.) | 64-65 Educ. (Yrs.) | 66-67 Min. Age (Yrs.) | 68 Tested By | 69-71 Physical Demand | 72-74 Work Cond. | 75-79 80 State Use |
|---|---|---|---|---|---|---|---|---|---|
| Dollars Cents | 1. ___ Hour 4. ___ Month<br>2. ___ Day 5. ___ Year<br>3. ___ Week 6. ___ Other | | | | | 1. ___ Emplr.<br>2. ___ E. S.<br>3. ___ Other | | | 4 |

JOB SUMMARY: ENTER HOURS/SHIFT/DAYS/HOW TO REACH/REMARKS AND SPECIAL INFORMATION

| 17-18 19 20- CC 04 TC 2 | Card 4 | 80 4 |
|---|---|---|

| 17-18 19 20- CC 05 TC 2 | Card 5 | 80 4 |
|---|---|---|

APPENDIX B—Continued

| 17-18 | 19 | 20- | Card 6 | 80 |
|---|---|---|---|---|
| CC | TC | | | |
| 06 | 2 | | | 4 |

| 17-18 | 19 | 20- | Card 7 | 80 |
|---|---|---|---|---|
| CC | TC | | | |
| 07 | 2 | | | 4 |

| 17-18 | 19 | 20- | Card 8 | 80 |
|---|---|---|---|---|
| CC | TC | | | |
| 08 | 2 | | | 4 |

| 17-18 | 19 | 20- | Card 9 | 80 |
|---|---|---|---|---|
| CC | TC | | | |
| 09 | 2 | | | 4 |

MSES 514 (R 7/75)

**John W. KNOX, Everett B. Best, et al., Plaintiffs,**

v.

**AMERICAN NATIONAL BANK IN ST. LOUIS et al., Defendants.**

**No. 76–685C(2).**

United States District Court,
E. D. Missouri, E. D.

March 14, 1980.

