### EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### v.

### ATLAS PAPER BOX COMPANY.

#### No. CIV-1-83-251.

United States District Court, E.D. Tennessee, S.D.

Jan. 30, 1987.

David L. Slate, Gen. Counsel, Jeff Bannon, Michael A. Middleton, Asso. Gen. Counsel, Office of Gen. Counsel, E.E.O.C., Washington, D.C., Lawrence J. Kamenetzky, Supervisory Trial Atty., Calvin C. Williams, Jr., Katharine W. Kores, Sr. Trial Attys., E.E.O.C., Memphis, Tenn., for plaintiffs.

Frank P. Pinchak, Humphreys, Hutcheson & Moseley, William E. Godbold, III, Gregory M. Leitner, Leitner, Warner, Moffitt, Williams, Dooley, Carpenter & Napolitan, Chattanooga, Tenn., for defendants.

## MEMORANDUM OPINION

HULL, Chief Judge.

The Equal Employment Opportunity Commission (EEOC) brought this action against the Atlas Paper Box Company (Atlas) alleging racial discrimination in the hiring of office and clerical workers, over the period from 1969 through 1984, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq.* This action focused on the fact that Atlas uses the Wonderlic Personnel Test, a cognitive ability test, in the screening of job applicants. The EEOC contends that Atlas uses this test in order to eliminate black applicants as part of a policy and practice of keeping a racially homogeneous, white office staff. The action came to trial, without intervention of a jury, on November 3, 1986. The following memorandum presents this Court's findings of fact and conclusions of law.

Atlas makes boxes, school paper, commercial envelopes, and related items. It has two payrolls—plant workers paid on an hourly basis and office workers who are salaried. Although there are many blacks employed in the plant, Atlas has never had a black person working in its office. Atlas' clerical staff numbers from 25 to 30 workers. None of these people have job descriptions defining their tasks and they are expected to be able to move around and cover different assignments. Atlas rarely advertises clerical positions or uses employment agencies. As a rule, when extra help is needed, it brings in temporary help and offers them permanent positions if they work out well. Each applicant for a permanent position is expected to fill out a questionnaire and provide the typical information about education, past work experience, etc. Applicants are also given a typing or keypunch test, the Wonderlic test, and an interview. However, the record from the many years at issue indicates that, from time to time, a quick judgment is made either to hire or reject and the tests or interviews may be omitted. There is no question that the complete hiring procedure has been truncated from time to time for both black and white applicants.

Some people have even been hired first and tested later. When Atlas decides it needs to hire somebody, it usually selects from those who have applied in the very recent past and does not review the earlier applications kept on file. It is evident that many qualified white applicants and an occasional qualified black were not hired simply because they applied at a time when Atlas had no opening.

Trial testimony indicated that Atlas management decided to use the Wonderlic Personnel Test as part of its job application process back in 1969. The company did some unsystematic experimentation with the test, trying it out on management, family members and employees in the clerical staff whose relative performance was already known. No formal attempt was ever made to verify the validity of the Wonderlic test as a predictor of job performance at Atlas. Although the Wonderlic manual suggests a hiring score of 25 for secretarial help, 21 for typists, 19 for file clerks, and 18 for telephone operators, the Atlas management decided that it would try to hire people who scored 25 or better for all of its office positions. The reasons given were that this would ensure a highly qualified staff of people capable of covering each other's jobs and suitable for advancement within the company. In addition, the company was impressed with information that money could be saved and production and job satisfaction increased by having a highly intelligent work force. There was no evidence that this initial decision was racially motivated.

There was some evidence that the test was administered in a biased fashion. Atlas apparently ignored the recommendation in the Wonderlic manual that a score adjustment be made on the basis of race to eliminate possible cultural bias in test results. Atlas also apparently failed to give the score adjustment suggested for age to black applicants although the age adjustment was made on occasion for white applicants. However, there is no indication that any black applicant would have qualified if these adjustments had been made.

In this lawsuit, the EEOC attempted to prove that the Wonderlic test had an impermissibly adverse impact on black applicants and that the test was not a valid instrument for predicting successful job performance for Atlas. Much of the trial was a battle of the experts.

Dr. John E. Hunter, Professor of Psychology at Michigan State University, testified that the Wonderlic test is a good measure of cognitive ability—mathematical reasoning, verbal skills, and spatial aptitude. He testified that the test is fair to minority applicants and better than any other predictor of success on the job such as level of training, previous work record, or the impression made in the interview. He testified that validation studies made at other companies and on other groups of workers have indicated that the Wonderlic is a valid test for all types of clerical work. The more complex the clerical task, the higher the correlation was between a good score on the Wonderlic and successful performance on the job.

Although this testimony was not actually contradicted, Dr. Richard S. Barrett, an industrial psychologist, questioned the appropriateness of generalizing between other validation studies and the work situation at Atlas. In addition, he pointed out that Atlas suffered from a relatively high employee turnover rate possibly because it was selecting overqualified employees who found their jobs boring.

In addition, Dr. Donald J. Schwartz of the EEOC testified that the use of the Wonderlic test had had a statistically significant adverse impact on black applicants at Atlas during the 1969–1979 period although apparently not during the 1980–1984 years.

Thomas E. Geraghty, an expert on management policy from the University of Tennessee at Chattanooga found no statistically significant adverse impact on black applicants after 1978.

It is extremely difficult to make any sense out of the evidence on the issue of adverse impact. This is partly because Atlas had so many more white applicants than black applicants over the 16-year peri-

od at issue and partly because, for reasons unknown, not all applicants of either race were tested. We do know that, over the period in question, 828 whites applied for clerical positions with Atlas and only 63 blacks applied for these same jobs. We also know that 551 whites scored less than 25 on the Wonderlic and 49 blacks scored less. No black scored higher than 25 and only one achieved a 25. Seven black applicants scored 20 or better over the 16–year period. Of the whites tested, 148 scored a 25 or better although not all of them were hired. During the 16 year period, 121 clerical workers were hired and of these, 29 had scores less than 25 on the Wonderlic—4 had scores of less than 20. One of these four was the daughter of a corporate manager. Another retook the test and scored a 22. Nothing about these figures mandates a finding of disparate impact or disparate treatment of blacks.

Although the evidence was not presented in this fashion at trial, the Court has decided to review Atlas' hiring history on a year-by-year basis to see if it was, indeed, hiring the most qualified applicant or if there is any indication that it used the Wonderlic test as a pretext to accomplish racial discrimination.

In 1969, the year the Wonderlic test was introduced at Atlas, there were no black applicants.

In 1970, there were 76 white applicants and 6 black applicants. One of these, Daisey Myers, applied on September 1, 1970, and scored a 20. The others had less impressive scores. Nine whites had been hired in the first part of 1970, with scores of 33, 33, 24, 26, 22, 31, 19, and 26, all before Ms. Myers applied. Ten other white applicants with scores ranging from 25 to 35 had been passed over for reasons unknown—presumably because no position was open at that moment. After Ms. Myers applied, three whites scoring higher than she did were passed over and four whites were hired. Those hired scored 28, 23, 24, and 27. While it is clear that at least one white was hired in 1970 who scored less than Ms. Myers, she was hired before Ms. Myers had even applied. There

is nothing in the data from 1970 to suggest racial discrimination.

In 1971, there were 77 white and 5 black applicants. Of the black applicants, Ms. Bettye Kendrick had the highest Wonderlic score—a 22 achieved on July 20, 1971. Six whites had been hired that year before Ms. Kendrick came in. Their scores were 32, 30, 24, no score, 35, and 28. After she applied, five whites scored as well or better than she did, but were not hired. On August 16, a white applicant named Glenda Hutson, who had scored only 21 on the Wonderlic was actually hired. In September, another white was hired who had scored a 25. Three whites who scored 25 or better were passed over and a temporary clerk who scored only 22, but took the test after her hiring, was hired in October. There is nothing particularly suspicious about Atlas' hiring pattern in 1971.

In 1972, 47 whites and 2 blacks applied for clerical positions with Atlas. Neither black applicant scored well on the Wonderlic test. The whites hired that year tested as follows: 27, 21, 33, 30, 29, 25, 26, and 23—all considerably higher than the black applicants.

In 1973, there is the first possible suggestion of racial bias in the hiring pattern. Twenty-two whites and 3 blacks applied for positions. The blacks scored 16, 16, and 14 on the Wonderlic. The whites hired scored 23, 21, 16, and 23. Obviously, one white applicant, a Ms. Dickerson, scored no better than two of the three black applicants. The significance of this is unclear, however, since Ms. Dickerson took the test two weeks *after* she was hired. There is nothing in the record to indicate whether or not she was retained past an initial probationary period. Seven other white applicants in 1973 scored better than 16 and were not hired.

In 1974, 54 whites and one black applied for clerical work with Atlas. The black applicant was not tested. The whites hired in that year had scores of 27, 26, 17, 27, 23, and 21. Not all white applicants that year were tested either. Ten whites who scored over 25 were not hired—possibly because

they presented themselves when there was no actual opening.

In 1975, 47 whites and 3 blacks applied. The blacks scored 19, 8, and 9. Four of the six whites hired had taken the test and scored 19, 25, 22, and 20.

In 1976, 36 whites and 1 black applied. The black candidate scored 12 on the Wonderlic. Eight whites were hired that year. Those that were tested scored 26, 26, 19, and 20.

In 1977, there were 43 white applicants and 4 blacks. Three of the blacks were tested and one, Mary Davis, scored a 23 on March 17, 1977. Nobody was hired until June 30, when a white woman, Mary E. Hood, with a Wonderlic score of 28 was hired. Three more whites were hired after that with scores of 31, 28, and 23. In 1977, there were 12 other white applicants who scored as well as Ms. Davis or better and also were not hired.

In 1978, there were 51 white applicants and 6 blacks. Of the blacks who applied, the one who scored the highest was a Gwendolyn Stinson who scored a 20 in August. Nine white people were hired that year with scores of 30, 27, 19, 24, 28, 26, 25, 25, and 30. The next hired after Ms. Stinson's application was a Ms. Foster with a score of 24.

In 1979, there were 156 white applicants and 9 blacks. None of the blacks scored well. Nine people were hired that year with scores, when known, of 32, 32, 37, 30, 34, 30, 31, and 26.

In 1980, there were 101 white applicants and 12 blacks. The highest scoring black applicant, Rozena Green, achieved a 20 on the Wonderlic. Of the eleven whites hired, the test scores, where known, were 32, 24, 26, 26, 30, 22, 25, 26, 32, and 28. One of the black applicants, a Ms. Beverly Wilson, scored a 25 in July of 1980. It is unfortunate that Atlas did not seize upon the opportunity to hire this highly intelligent black applicant. However, nobody was hired until August 14, 1980, when Atlas hired a Miss Carolyn Miller with a Wonderlic score of 32. While it is clear that Atlas was not actively seeking black applicants, there is no clear indication of racial discrimination.

In 1981, there were 30 white applicants and 5 blacks. None of the blacks scored well on the Wonderlic test. The 7 whites hired that year had test scores of 35, 24, 33, 28, 24, 30, and 31.

In 1982, no blacks applied for clerical positions. Twenty-three whites applied; three were hired; two were tested and achieved scores of 30 and 24.

In 1983, there were 15 white applicants and 4 blacks. Unfortunately, 3 of the 4 black applicants were not tested. There was only one person hired into a clerical position that year, a Ms. O'Neil who was hired in April before any of the blacks had applied. Of the three blacks who applied, one, a Ms. Dodds, was not tested because she was already personally known to certain people at Atlas and disliked. It is not clear why the others were not tested.

In 1984, there were 31 white applicants but no blacks. The 3 whites hired that year had scores of 29, 26, and 30.

█ In a disparate treatment case, the EEOC has the burden of proving the existence of a pattern and practice of race discrimination and discriminatory intent. *Pegues v. Mississippi State Employment Service*, 699 F.2d 760, 763 (5th Cir.1983).

The Court has given careful consideration to Atlas' actual hiring decisions over the 16 years at issue and does not find a racially discriminatory pattern or practice.

█ In a disparate impact case, the EEOC must produce evidence that the employment practice, such as the use of the Wonderlic test, selects applicants in a racial pattern which is significantly different from the general pool of applicants. *Rowe v. Cleveland Pneumatic Co.*, 690 F.2d 88, 93 (6th Cir.1982). As the Court understands the statistical proof offered in this case, the EEOC has made a *prima facie* case that the use of the Wonderlic test for screening Atlas' clerical applicants had a statistically significant adverse impact on black applicants at least before 1978, although apparently not in recent years. Once a showing of disparate impact has

been made, the burden shifts to the employer to show that the use of the test is job related. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

While no formal validation study was performed at Atlas itself, it is obvious that any attempt to validate the Wonderlic test on a clerical workforce as small as the one at Atlas would have been statistically meaningless. Much evidence was offered to show that the use of a cognitive ability test as an applicant screening device is more reliable than any other single predictor of job success. The Court is satisfied that Atlas effectively rebutted the *prima facie* case and that there was nothing to suggest that the use of the Wonderlic test was a mere pretext for racial discrimination. A close review of the hiring decisions made over the many years at issue shows a concerted attempt to hire the most qualified employees. While there were a few black applicants who met Atlas' stringent standards, they were never passed over for less well qualified white applicants.

Accordingly, the Court finds that the plaintiff has failed to carry its burden of proof on either its disparate treatment or disparate impact theory of liability. Judgment will enter in favor of the defendant Atlas Paper Box Company.